ROBERT S. BREWER, JR.
United States Attorney
MELANIE K. PIERSON
Assistant U.S. Attorney
California Bar No. 112520
Office of the U.S. Attorney
880 Front Street, Room 6293
San Diego, CA 92101
Tel: (619) 546-7976
Fax: (619) 546-0450
Email:  Melanie.Pierson@usdoj.gov

Attorneys for the United States

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| UNITED STATES OF AMERICA, | Case No. 20cr2871-JM |
|---|---|
| Plaintiff, | **GOVERNMENT'S RESPONSE AND OPPOSITION TO DEFENDANT'S MOTION TO COMPEL DISCOVERY** |
| ESTER GARIBAY CHIRINOS, | |
| Defendant. | DATE: December 4, 2020<br>TIME:  9:00 a.m. |

   COMES NOW the plaintiff, United States of America, by and through its counsel, United States Attorney Robert S. Brewer, Jr., and Assistant U.S. Attorney Melanie K. Pierson, and hereby files its Response and Opposition to Defendant's Motion to Compel Discovery.  Said response is based on the files and records of the case.


   DATED: November 30, 2020        Respectfully submitted,

                                   ROBERT S. BREWER, JR.
                                   United States Attorney

                                   /s/Melanie K. Pierson
                                   Assistant United States Attorney

I.
STATEMENT OF THE CASE

On August 19, 2020, a complaint was filed in the Southern District of California, charging the defendant with Smuggling, in violation of Title 18, United States Code, Section 545. The defendant was arraigned on this case September 3, 2020, and entered a not guilty plea.

On September 17, 2020, the defendant waived indictment and was arraigned on an Information with the same charge, and again pled not guilty. A hearing on all motions was set for October 30, 2020.

On October 29, 2020, the defendant filed a motion to compel discovery. The United States responds to that motion herein.

II.

STATEMENT OF FACTS

At approximately 3:44 p.m. on August 11, 2020, Esther Guadalupe GARIBAY Chirinos entered the United States at the San Ysidro Port of Entry as the driver of a gray Honda Pilot SUV bearing California license plates with two minors as passengers. Customs and Border Protection (CBP) Officer Galindo asked GARIBAY if she had anything to declare, and GARIBAY responded that she had nothing to declare. CBP Officer Galindo then observed a large suitcase, a travel bag, and a backpack in the vehicle, and asked GARIBAY what was in the suitcase. GARIBAY stated that it was clothing. CBP Officer Galindo then inspected the suitcase and found bottles of pesticides. He then inspected the travel bag and the backpack and found additional bottles of pesticides. While CBP Officer Galindo was writing the referral of the vehicle to Secondary for additional inspection, GARIBAY stated that she

*Response in Opposition to Motion to Compel Discovery*  2  20cr2871-JM

did not know it was illegal to bring these chemicals, and that she was doing it as a favor for someone else. CBP Officer Galindo then referred the vehicle to Secondary for further inspection.

In the Secondary inspection area, CBP Officer Rodriguez was preparing to inspect the vehicle when GARIBAY stated "it's in the back," referring to the suitcase. GARIBAY also told CBP Officer Rodriguez the pesticides were for her family member's legal marijuana dispensary in California. During the Secondary inspection CBP officers seized a total of 120 containers of Mexican pesticides and fertilizer. Specifically, the CBP officers seized: four one-liter bottles of "Arquia 18 CE", thirty one-liter bottles of "Metralla Max",  eleven one-liter bottles of "Palgus", twelve one-liter bottles of "Ami Krone", thirty one-liter bottles of "Hortimec", twenty-four one-liter bottles of "Magister", and nine one-kilogram packages of "Gro Green Campbell Fertalizante."

After being advised of her Constitutional rights and waiving her rights in writing, GARIBAY stated that a relative asked her to bring the pesticides across from Mexico. GARIBAY stated that, at her relative's request, she purchased some of the pesticides at a store in Tijuana, Mexico, and picked up the rest of the pesticides at a bus terminal in Tijuana, Mexixo. GARIBAY explained that her relative had arranged for some of the pesticides to be shipped from Guadalajara, Mexico to Tijuana, Mexico on a bus. GARIBAY stated that this relative paid her $100 to bring the pesticides into the United States from Mexico.

According to the labels, "Arquia 18 CE" and "Hortimec" contain the active ingredient abamectin. EPA special agents advised that, in the

United States, there are no registered products with these concentrations of abamectin. Abamectin is a restricted use pesticide when greater than two percent concentration which is most similar to "Arquia 18 CE." Abamectin is restricted use for most, or seventy-five percent, of the products similar to "Hortimec." In the United States, federal regulations limit the sale and use of restricted-use pesticides to applicators certified by a program approved by the EPA, who have received training in mitigating the dangers of such pesticides, and persons under their direct supervision. A search of the database of certified pesticide applicators in California revealed that GARIBAY holds no such certification.

According to the label, "Metralla Max" contains the active ingredients imidacloprid and Lambda-cyhalothrin. In the United States, there are no registered products with this concentration and combination of the active ingredients imidacloprid and Lambda-cyhalothrin. Based on a review of similar products registered, nearly all products containing greater than thirteen percent Lambda-cyhalothrin alone are restricted use, and products containing greater than nine percent Lambda-cyhalothrin in concert with any active ingredient other than piperonyl butoxide, are also restricted use which would be similar to "Metralla Max." Lambda-cyhalothrin is restricted use because it is fatal if ingested, harmful if absorbed through the skin, and extremely toxic to fish and other aquatic organisms.

According to the label, "Palgus" contains the active ingredient spinetoram. According to the label, "Ami Krone" contains a plant growth

regulator for use on food crops. According to the label, "Magister" contains the active ingredient fenazaquin. EPA special agents advised that in the United States, spinetoram, plant growth regulators for use on food crops, and fenazaquin are pesticides, but are not restricted use pesticides.

Federal law prohibits the distribution and sale of canceled or unregistered pesticides. 7 U.S.C. §136j(a)(1)(A). Only pesticides registered with the EPA may be imported or sold in the United States. 7 U.S.C. §136o(c). All pesticides intended for use in the United States must bear their EPA registration number on their labels, preceded by the phrase "EPA Registration No." or "EPA Reg. No." 40 C.F.R. §156.10(e). In addition, all required information on a label must appear in the English language. 40 C.F.R. §156.10(a)(3). The containers of pesticide found with GARIBAY were labeled only in Spanish and bore no EPA registration numbers.

The lawful importation of pesticides into the United States requires a Notice of Arrival to be provided to U.S. Customs, pursuant to 19 C.F.R. §12.112. GARIBAY provided no such Notice of Arrival for the pesticides in this case.

//
//
//
//
//
//
//

III

POINTS AND AUTHORITIES

A. THE GOVERNMENT HAS AND WILL COMPLY WITH RULE 16 OF THE FEDERAL RULES OF CRIMINAL PROCEDURE.  ANY ADDITIONAL DISCOVERY DEMANDS OF THE DEFENDANT SHOULD BE DENIED.

1. Status of Discovery

The government has made available approximately 196 pages of discovery. The initial discovery provided on September 3, 2020, included the CBP reports of the primary and secondary officers, copies of the documents seized from the defendant, the notes of the interviewing agents, the signed advisement of rights forms, the seizure forms, the photographs taken at the Port of Entry, the vehicle registration, a summary of her criminal history, the referral slip, and the recorded interview of the defendant at the Port of Entry. On September 11, 2020, the videos from the inspections at the Port of Entry were disclosed.

A warrant was obtained to search her phone.  When the results of the search are available (which could be weeks or months, depending on how long it takes to unlock the phone), they will be disclosed.

To the extent that any evidence of prior similar acts exists, it may be found in the statements of the defendant and in the data downloaded from the phone.

This is a reactive case originating from the seizure at the Port of Entry.  Accordingly, there are no records of prior investigation of the defendant for this offense.  The government has not conducted any scientific testing in this case (nor is any anticipated) and does not anticipate the need for expert testimony.  The government will make the

appropriate inquiries regarding potential impeachment of its witnesses and disclose all *Giglio* and *Henthorn* materials one week before trial.

The government, to date, has provided discovery consisting of approximately 196 pages of documents, and three videos. The Government will continue to comply with the rules concerning discovery, as discussed below.

2. <u>The Government Has Already Disclosed Information Subject to Disclosure under Rule 16(a)(1)(A)and (B) of the Federal Rules of Criminal Procedure.</u>

The Government has already disclosed a written summary of the statements of the defendant, as well as the substance of any relevant oral statements she made in response to questions by Government agents, and the recordings of the interview at the Port of Entry.

The defendant is not entitled to summaries of oral statements of the defendant made to persons not known by her to be government agents, and the memorialization of any such statements in a written report does not make them discoverable as "written" statements of the defendants. <u>United States v. Hoffman</u>, 794 F.2d 1429, 1432, n.4 (9th Cir.1986).

The videos relating to the defendant's detention at the Port of Entry have also been produced. She was not arrested but was given a Notice to Appear. The notes of the interviewing agents have been produced. The TECS crossing records for the six months prior to the event will be produced within a week for the defendant and her vehicle.

3. <u>The Government Will Comply with Rule 16(a)(1)(D).</u>

The Government has provided the criminal history report for the defendant. Once the witnesses the government intends to call in its

case in chief are identified, records of any evidence of prior convictions for those individuals will be disclosed.

The Government is well aware of and will fully perform its duty under Brady v. Maryland, 373 U.S. 83 (1963) and United States v. Agurs, 427 U.S. 97 (1976), to disclose exculpatory evidence within its possession that is material to the issue of guilt or punishment, as well as its duty under Giglio v. United States, 405 U.S. 150 (1972) to provide information on any benefits provided to Government witnesses in exchange for their testimony and impeachment material. The Government agrees to provide this information at least one week prior to trial, after all of the trial witnesses have been identified.

4. The Government Will Comply with Rule 16(a)(1)(E).

The Government will permit the defendant to inspect and copy or photograph all books, papers, documents, photographs, tangible objects, buildings, or places, or portions thereof, which are within the possession, custody, or control of the Government, and which are material to the preparation of the defendant's defense or are intended for use by the Government as evidence-in-chief at trial or were obtained from or belong to the defendant, and agrees to preserve such evidence during the pendency of this proceeding.

The defendant is not entitled to all evidence known or believed to exist which is, or may be favorable to the accused, or which pertains to the credibility of the Government's case. As stated in United States v. Gardner, 611 F.2d 770 (9th Cir. 1980), it must be noted that:

"[T]he prosecution does not have a constitutional duty to

disclose every bit of information that might affect the jury's decision; it need only disclose information favorable to the defense that meets the appropriate standard of materiality." Id., 611 F.2d at 774-775 (citations omitted).

See also United States v. Sukumolachan, 610 F.2d 685, 687 (9th Cir. 1980) (the Government not required to create exculpatory material that does not exist); United States v. Flores, 540 F.2d 432, 438 (9th Cir. 1976) (Brady does not create any pretrial discovery privileges not contained in the Federal Rules of Criminal Procedure). All physical evidence collected to date will be preserved. The photographs taken at the Port of Entry have been disclosed.

    5.    The Government Will Comply with Rule 16(a)(1)(F)

No scientific testing of the pesticides has been performed. To the extent such evidence is created in the future, the Government will provide the defendant with the results or reports of physical or mental examinations, and of scientific tests or experiments, or copies thereof, which are within the possession of the Government, and will continue to provide any further such reports that by the exercise of due diligence may become known to the attorney for the Government and are material to the preparation of the defense or are intended for use by the Government as evidence-in-chief at the trial.

    6.    The Government Will Comply with Rule 16(a)(1)(G)

No reports of experts have been prepared to date. The Government will provide any summaries of expert testimony as such evidence is

identified as the case proceeds to trial, but no later than two weeks prior to trial.

6.  Jencks Material

Production of witness statements is governed by the Jencks Act, 18 U.S.C. § 3500, and need occur only after the witness testifies on direct examination. United States v. Taylor, 802 F.2d 1108, 1118 (9th Cir. 1986); United States v. Mills, 641 F.2d 785, 790 (9th Cir.), cert. denied, 454 U.S. 902 (1981). Indeed, even material believed to be exculpatory and therefore subject to disclosure under the Brady doctrine, if contained in a witness statement subject to the Jencks Act, need not be revealed until such time as the witness statement is disclosed under the Act. See United States v. Bernard, 623 F.2d 551, 556 (9th Cir. 1979). As a practical matter, the government has disclosed the reports of the investigation, so advance Jencks material has already been provided.

7. Prior Similar Act Evidence

To the extent that the government has evidence currently in its possession that might be argued to be admissible under Rule 404(b) relating to instances of the illegal imports of pesticides, it has been disclosed, or will be disclosed. Such evidence can be found in the statements of the defendant and may also be found in the information downloaded from the defendant's phone.

8.  Henthorn Material

The government will conduct a review of the personnel files of the federal agents involved in the case, and any impeachment material falling

within the purview of United States v. Henthorn, 931 F.2d 29 (9th Cir.1991) will be disclosed.

9. Impeachment Information

The defendant may be entitled to various categories of impeachment evidence, including bias or motive to lie, evidence of criminal investigation or convictions, and evidence affecting perception. The government has disclosed much of the evidence currently in its possession that falls into this category, but this disclosure is not yet complete.

The government will disclose such evidence in compliance with its continuing obligations under Brady v. Maryland, 373 U.S. 83 (1963) and Giglio v. United States, 405 U.S. 150 (1972) no later than one week before trial, when the witnesses for trial have been identified.

B. PHYSICAL EVIDENCE WILL BE PRESERVED.

The United States has directed the case agents to preserve all physical evidence in the case, including the pesticides, the defendant's personal effects, her cell phone, and the vehicle, as well as the agents' notes.

IV.
CONCLUSION

The United States respectfully requests that the court deny the defendant's motion, to the extent it is opposed herein.